UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| WAYNE BLACK, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | Case No.: 5:11-CV-3835-RDP-JHE |
| } | |
| ALABAMA DEPARTMENT OF } | |
| CORRECTIONS, et al. } | |
| } | |
| Defendants. } | |

## MEMORANDUM OPINION

Plaintiff, Wayne Black, is an inmate in the Alabama penal system presently incarcerated at the Limestone Correctional Facility ("LCF"), in Harvest, Alabama. On November 4, 2011, he filed this pro se action pursuant to 42 U.S.C. § 1983. (Doc. #1). Plaintiff alleges that he has been deprived of rights, privileges, or immunities afforded him under the Constitution or laws of the United States and names as Defendants: Commissioner Kim Tobias Thomas, Dr. Blough, Nurse Debra Means, Nurse Hunt, and Warden Mitchem.[1] Plaintiff alleges that he has been denied adequate medical care for his Hepatitis C with which he was diagnosed while in custody of the Alabama Department of Corrections. (Docs. #1, 6, 8). Plaintiff seeks declaratory and injunctive relief, as well as damages. (Doc. #6 at 4).

### I.     Procedural History

Plaintiff filed his initial complaint (Doc. #1) on November 4, 2011, and thereafter has offered two amendments to it. (Docs. #6 and 8). Plaintiff's original complaint alleged that the Alabama Department of Corrections and Commissioner Kim Thomas were denying him medical

---

[1] Plaintiff's claims against Warden Mitchem were dismissed due to Plaintiff's failure to supply a correct address for Warden Mitchem after being ordered to do so. (Doc. #26).

treatment, but the pleading did not make any specific assertions.  This court ordered Plaintiff to file an amended complaint that states "clearly how each defendant violated his constitutional rights, the date(s) on which the incident(s) occurred, and where the incident(s) occurred." (Doc. #7)(emphasis in original).  Plaintiff filed an amended complaint that alleges that Commissioner Thomas has caused him to be denied medical treatment without any supporting evidence.

On July 9, 2012, the court entered an Order for Special Report directing that copies of the complaint in this action be forwarded to each of the named Defendants and requesting that Defendants file a special report addressing the factual allegations of Plaintiff's complaint. (Doc. #10).  Defendants were advised that the Special Report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (*Id.*).  By the same Order, Plaintiff was advised that after he received a copy of the Special Report submitted by Defendants he should file counter affidavits if he wished to rebut the matters presented by Defendants in the Special Report.  (*Id.*).  Plaintiff was further advised that such affidavits should be filed within twenty days after receiving a copy of Defendants' Special Report.  (*Id.*).

On July 26, 2012, Defendants Blough, Mean, and Hunt filed a Special Report accompanied by copies of portions of Plaintiff's medical records and the affidavit of Debra Means, CRNP. (Doc. #15).  On July 27, 2012, Plaintiff responded to the Special Report filed by Blough, Means, and Hunt.  (Doc. #16).  He also filed two separate rebuttals to that Special Report, on August 10 and 24, 2012.  (Docs. #18, 19).  Thereafter, on September 7, 2012, Defendant Thomas filed a Special Report and Affidavit. (Doc. #21).  On February 6, 2013, Plaintiff was notified that he would have twenty days to respond to the motion for summary judgment, by filing affidavits or other material if he chose. (Doc. #27).  Plaintiff was advised of

the consequences of any default or failure to comply with Federal Rule of Civil Procedure 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). On February 22, 2013, Plaintiff responded to the Special Report of Defendant Thomas and again addressed his claims against the other three remaining Defendants. (Doc. #29). He also filed a brief in support of his arguments on July 3, 2013. (Doc. #32).

On July 18, 2013, the court entered an order for a supplemental Special Report requesting additional evidentiary submissions from Defendants. (Doc. #32). On July 29, 2013, Defendants filed a supplemental Special Report (Doc. #33) accompanied by the affidavits of Dr. Hugh Hood, M.D. (Doc. #33-1), the Federal Bureau of Prison's Clinical Practice Guidelines related to the evaluation and treatment of Hepatitis C (Doc. #33-2), Hepatitis C Treatment Referral Forms for Plaintiff (Doc. #33-4, 33-6), a Hepatitis C Flow Sheet for Plaintiff (Doc. #33-5), and other evidentiary material (Doc. #33). Defendant Thomas supplemented her special report by filing an affidavit of Brandon Kinard. (Doc. #35). Plaintiff responded by filing a Rebuttal and Response in opposition to summary judgment and attached an affidavit. (Docs. #36, 38).

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(2), the complaint was referred to the undersigned Magistrate Judge for a preliminary Report and Recommendation. *See McCarthy v. Bronson*, 500 U.S. 136, 111 S. Ct. 1737, 114 L. Ed. 2d 194 (1991). However, the Magistrate Judge assigned the case retired from judicial service in June 2013. Accordingly, rather than require a new Magistrate Judge to become familiar with this case and issue a Report and Recommendation, the court has withdrawn the reference and will decide the case by entering this Memorandum Opinion and an Order.

## II.   Summary Judgment Standard

Because the Special Reports of Defendants are being considered a motion for summary judgment, the court must determine whether the moving party, Defendants, are entitled to

judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Federal Rule of Civil Procedure 56.* In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989). Unless Plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1533-34 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

### III. Rule 56 Facts for Summary Judgment Analysis

Applying the above standard to the evidence before the court, the following facts are undisputed or, if disputed, are taken in a light most favorable to Plaintiff.

Plaintiff alleges that he has been denied adequate medical care for his Hepatitis C condition. In 2003, while in the custody of the Houston County Jail, Plaintiff learned he tested positive for Hepatitis C. (Doc. #8 at 4). Hepatitis C is an infectious disease affecting primarily the liver caused by the Hepatitis C virus ("HCV"). (Doc. #33-1 at 4). Individuals infected with Hepatitis C are often asymptomatic, but chronic infection can lead to scarring of the liver, and ultimately cirrhosis. *Id.* In some cases, individuals who develop cirrhosis may later suffer liver failure, liver cancer, or life threatening esophageal and gastric varices. *Id.*

Approximately 1,800 prisoners who are incarcerated within the Alabama Department of Corrections are infected with Hepatitis C. (Doc. #33-1 at 4). The Alabama Department of Corrections has developed a Hepatitis C Treatment Program, but not all inmates diagnosed with Hepatitis C are enrolled in the program. (Doc. #33-1 at 3). To determine which inmates diagnosed with Hepatitis C should receive treatment, the Alabama Department of Corrections screens the applicants using a policy based on the Federal Bureau of Prisons Clinical Practice Guidelines. *Id.* These guidelines explain the various treatment options that are available for Hepatitis C and provide both the indications and contraindications for the therapies. *See* (Doc. #33-2).

Under the policy, an inmate who wishes to enter the Treatment Program must have a Hepatitis C treatment referral form submitted to the Alabama Department of Corrections by the treating medical staff at the facility where the inmate is housed. (Doc. #33-1 at 3, 5). The

5

Alabama Department of Corrections then reviews the referral to determine whether the inmate would be a possible candidate for the program. (Doc. #33-1 at 5).

Since learning of his diagnosis, Plaintiff has continually asked for treatment for his Hepatitis C. He requested treatment from the medical personnel and administrators at the Houston County Jail and the Kilby Correctional Facility in 2003, and again at Holman Prison after his transfer there. On each occasion, he was told treatment could only be authorized by the Alabama Department of Corrections ("DOC") and his name would be put on a list for consideration, but he never received treatment.[2] (Doc. #8 at 4). The undisputed evidence also shows that the Alabama Department of Corrections has contracted with Corizon to provide medical treatment, and the Alabama Department of Corrections has delegated to medical professionals the decisions as to the proper medical care.

Plaintiff is an inmate currently incarcerated at the Limestone Correctional Facility since August 26, 2003. The medical Defendants in this case are Debra C. Means, CRNP, a nurse practitioner who works at the Health Care Unit at the Decatur Work Release Facility; Debbie Hunt, the Health Services Administrator; and John M. Blough, D.O. Nurse Means has no knowledge of when Plaintiff contracted Hepatitis C. However, in March 2009, she detected that Plaintiff was positive for that disease after lab work was ordered. Plaintiff asked her if he could receive treatment for his Hepatitis C. (Doc. #15-1 at 2; Doc. #38.). Nurse Means told him that

---

[2] The court notes that, although no motion was filed, within the body of numerous pleadings, Plaintiff indicated he would like the Court's assistance in obtaining medical records to establish he was diagnosed with Hepatitis C in 2003 and had not received treatment. However, because neither fact is at issue, and as that assertion is not relevant to Plaintiff's claim that he has been provided inadequate medical care by these Defendants, any such records are not material here. Moreover, any claims as to the lack of treatment during much of that time period would be barred by the statute of limitations. To the extent that Plaintiff wished to name additional medical personnel at the correctional facilities involved with his care during that time, even if the claims were not barred by the limitations period, as will be seen, Plaintiff has failed established facts to show deliberate indifference to his medical needs.

she could not provide it to him because the determination as to who received treatment was made by the DOC; however, stated she would file the paperwork. (Doc. #38 at 1).

Nurse Means next saw Plaintiff at the Limestone Correctional Facility on October 5, 2011. At that time, Plaintiff again indicated that he wished to be evaluated for treatment for his Hepatitis C. The Alabama Department of Corrections has developed a policy that follows the Federal Bureau of Prisons Guidelines to determine who meets the criteria for Hepatitis C treatment. Thus, the decision about whether an inmate/patient is a candidate for Hepatitis C treatment is not one that a nurse practitioner (nor any other medical practitioner at a corrections facility) can make.

Nurse Means informed Plaintiff of the selection process for the Hepatitis C Treatment Program, and in particular that the program was administered solely by the Alabama Department of Corrections. Nurse Means saw Plaintiff again on December 28, 2011. At that time she completed a Hepatitis C Treatment Request Form for Plaintiff and provided a copy to the Health Services Administrator, Debbie Hunt. In addition, that form was telefaxed to Brandon Kinard at the Alabama Department of Corrections. Once again, Plaintiff was informed that whether to accept an inmate into the Hepatitis C Treatment Program is a decision made solely by the Alabama Department of Corrections, not the medical staff at the individual correction facility, and specifically not at the Limestone Correctional Facility.

Nurse Means saw Plaintiff again on June 27, 2012. She ordered a KUB X-ray, the results of which were normal. Plaintiff again inquired about admission into the Hepatitis C Treatment Program, and was told again that the medical staff at Limestone Correctional Facility had no involvement in that decision. Throughout the course of her interactions with Plaintiff, Nurse Means observed him to be in stable condition. (Doc. #15-1 at 3).

Plaintiff spoke with Dr. Blough in 2011 and requested treatment for his Hepatitis C. (Doc. #38 at 1). Plaintiff was experiencing serious pain in his whole body, poor eyesight, and difficulty and pain when using the toilet. (*Id.*; Doc. #8 at 5). Plaintiff asserts that Dr. Blough told Plaintiff the Hepatitis C had blocked his bowels and provided Plaintiff with laxatives, but stated that was all he could do for him. (Doc. #38 at 1). There is no evidence to suggest that the issues about which Plaintiff complained had or have any medical relationship to his Hepatitis C. (Doc. #33-1 at 3).

On August 17, 2011, Plaintiff filed a medical grievance with Dr. Blough requesting treatment for his Hepatitis C and stating that he had been refused treatment for nine years and was in "serious pain." (Doc. #29 at 7). On August 28, 2011, Plaintiff filed a grievance with Warden Mitchem, reiterating his request for treatment. (Doc. #29 at 1).

On September 6, 2011, Health Service Administrator Debbie Hunt responded to the grievance, advising Plaintiff that his liver enzymes were being monitored every three to six months in the Chronic Care Clinic. (Doc. #29 at 8). Defendant Hunt further informed Plaintiff the Alabama Department of Corrections decides who gets treatment based on whether certain criteria have been met, and Limestone Correctional Facility was not currently treating anyone for Hepatitis C and she did not know when they would begin another group. (*Id.*).

In September and October 2011, Plaintiff sent two letters titled "Medical Grievance" to Commissioner Kim Thomas stating that he was being refused treatment for his Hepatitis C. (Doc. #29 at 5, 6). He received no response. (Doc. #29 at 1).

In October of 2011, Plaintiff again asked Nurse Means about receiving treatment for his Hepatitis C. (Doc. #15-1 at 2). Nurse Means responded by once again reiterating the selection process for the Treatment Program was done solely by the Alabama Department of Corrections,

8

discussing the need for him to be released from PC status to qualify, and telling him that once he was, she would put in the paperwork so he could be considered for treatment. (Doc. #15-1 at 2; Doc. #15-2 at 8). Lab work taken at the time indicated Plaintiff was not developing complications from his disease (Doc. 33-1 at 4-5; Doc. #33-4; Doc. #33-5), and Nurse Means found Plaintiff's condition to be stable. (Doc. #15-1 at 3).

On December 28, 2011, Nurse Means saw Plaintiff again and completed a Hepatitis C Treatment Request Form. (Doc. #15-1 at 2). She gave a copy of the form to the Health Service Administrator Debbie Hunt, and faxed a copy to Brandon Kinard at the Alabama Department of Corrections. (*Id.*). She again told Plaintiff the decision regarding treatment was made not by the medical staff at the individual correctional facilities, but by the Alabama Department of Corrections. (Doc. #15-1 at 3). Nurse Means continued to monitor Plaintiff's condition and found it to be stable. (*Id.*)

On June 27, 2012, Nurse Means examined Plaintiff, ordered a KUB x-ray, which was normal, and again informed Plaintiff the medical staff at Limestone was not involved in the decision making process regarding admission into the Hepatitis C Treatment Program. (Doc. #15-1 at 3). Nurse Means found Plaintiff's condition to be stable. *Id.* She believed the application she had previously submitted was still pending with the Alabama Department of Corrections. (Doc. #15-1 at 4). Plaintiff continued to be closely monitored for his Hepatitis C at the Limestone Correctional Facility, and the results of his lab work remained within the normal levels. (Doc. #33-1 at 5). The Alabama Department of Corrections never received the treatment referral form Nurse Means faxed on December 28, 2011. (Doc. #33-1 at 3).

Dr. Hugh Hood, a licensed physician, Board Certified internist, and the Associate Regional Medical Director for Corizon Medical Services, reviewed Plaintiff's medical records

9

and is familiar with the medical treatment the plaintiff received. (Doc. #33-1 at 1). The records reflect Plaintiff has been seen frequently at the Chronic Care Clinic, where his condition has been closely monitored. (Doc. #33-1 at 5). Blood labs have been drawn and read to determine whether Plaintiff's condition is stable or worsening, and the medical staff have checked for indications of a decline in the platelet count, an increase in the AST platelet ratio index ("APRI")[3] score, and/or a decline in the absolute neutrophil count ("ANC") score, all of which may indicate the progression of the disease and need for treatment. *Id.*

In October 2011, Plaintiff's APRI was 0.37, his platelet count was 259,000, and his ANC levels were 2.44. (Doc. #33-1 at 4). Those numbers were stable and within the normal range, giving no indication Plaintiff was developing problems. (*Id.*). Based on those numbers, Plaintiff would not have been a candidate for the Hepatitis C Treatment Program in December of 2011. (Doc. #33-1 at 4).

Plaintiff has since complained of pain in his liver and, in June 2013, requested an MRI. (Doc. #31 at 2). A new Hepatitis C referral form was completed and forwarded to the Alabama Department of Corrections on July 29, 2013. (Doc. #33-6). On August 14, 2013, Plaintiff received an ultrasound of his liver, which showed it to be slightly swollen, but according to Dr. Whitley, was normal. (Doc. #36 at 2-3). The medical staff is continuing to monitor Plaintiff's condition, and both the staff and the Alabama Department of Corrections are determining whether he is a candidate for the Hepatitis C program and whether the Hepatitis C medications would benefit him. (*Id.*).

---

[3] The AST-To-Platelet Ratio Index ("APRI") is a validated predictor of Hepatic Fibrosis in patients with chronic Hepatitis C. The ANC is the absolute neutrophil count, which measures the amount of infection fighting white blood cells present in the blood. (Doc. #33-1 at 4).

The Department of Corrections Office of Health Services Hepatitis C Flow-sheet, which has tracked Plaintiff's blood work since April 2009, reveals that since 2011, Plaintiff's platelet count has decreased, the APRI score has increased slightly, and although the ANC score declined in 2012, it has since increased. (Doc. #33-5; Doc. #33-1 at 5). All of the readings remain within normal or acceptable limits. *Id.* Plaintiff does not appear to have any conditions that would preclude him from being accepted into the Hepatitis C Treatment Program, but also has none that would mandate his immediate placement in the program. (Doc. #33-1 at 6).

**IV.  Discussion**

    **A.  Plaintiff's Claim for Denial of Medical Care**

In order to establish liability under § 1983 for inadequate medical treatment, a prisoner must show that a failure to provide medical treatment amounted to cruel and unusual treatment in violation of the Eighth Amendment. The Supreme Court has held that it is only "deliberate indifference to serious medical needs of prisoners" which will give rise to a claim of cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "Medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991), quoting *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986). The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *Bass v. Sullivan*, 550 F.2d 229, 231 (5th Cir.).

Mere negligence is insufficient to support a constitutional claim. *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979). As stated by the *Estelle* court, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." 429 U.S. at 106.

Therefore, a mere accidental or inadvertent failure to provide medical care or negligent diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth Amendment. *See Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980).  Neither will a difference of opinion between an inmate and the institution's medical staff, as to treatment and diagnosis, alone give rise to a cause of action under the Eighth Amendment. *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976); *see also Estelle v. Gamble*, 429 U.S. at 106-08. Likewise, even when there is a disagreement between two doctors as to the course of treatment, that also does not state a violation of the Eighth Amendment because there may be several acceptable ways to treat a medical condition. *White v. Napoleon*, 897 F.2d 103, 110 (3rd Cir. 1990).

In *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985), the Eleventh Circuit held that an inmate's dissatisfaction with the medical treatment provided by the prison did not constitute a violation of the Eighth Amendment as long as the treatment provided did not amount to deliberate indifference.  The Eighth Amendment is implicated only when the prison doctors or guards intentionally and deliberately deny or delay access to medical attention to serious medical conditions.  *Barfield v. Brierton,* 883 F.2d  923, 938 (11th Cir. 1989).

Two components must be evaluated to determine whether Plaintiff has been subjected to cruel and unusual punishment.  "First, [the court] must evaluate whether there was evidence of a serious medical need; if so, [it] must consider whether [Defendants'] response to that need amounted to deliberate indifference."  *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir. 1989). Clearly, "not every injury or illness invokes the constitutional protection only those that are 'serious' have that effect."  *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1081 (3rd Cir. 1976).  Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if

those needs are 'serious.' *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). In *Estelle,* the court recognized that medical needs which require medical attention as a matter of constitutional law can range from "the worst cases," producing "physical 'torture or a lingering death,'" to "less serious cases," resulting from the "denial of medical care," which could cause "pain and suffering." *Estelle*, 429 U.S. at 103. A "serious" medical need has been defined as "one that has either been diagnosed by a physician as mandating medical treatment or one that is so obvious that even a lay person would recognize the need for a doctor's attention." *Laaman v. Helgemoe*, 437 F.Supp. 269, 311 (D.N.H. 1977). *See also Page v. Sharpe*, 487 F.2d 567, 569 (1st Cir. 1973). It is the necessity (not the desirability) of medical treatment sought which is important to the determination of whether medical officials have exhibited deliberate indifference. *Woodall v. Foti,* 648 F.2d 268, 272 (5th Cir. 1981).

Deliberate indifference can be shown in a variety of ways. As the Eleventh Circuit Court of Appeals noted:

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. "A doctor's decision to take an easier and less efficacious course of treatment" also constitutes deliberate indifference. Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference.

*Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (internal citations omitted).

A medical provider or prison official also acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or urgent medical condition that would be exacerbated by delay. *See Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1186-87 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *see also Harris v. Coweta*

*County*, 21 F.3d 388, 394 (11th Cir. 1994).  Delay in access to medical treatment can violate the Eighth Amendment when it is "tantamount to 'unnecessary and wanton infliction of pain.'" *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations omitted).  An inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Hill*, 40 F.3d at 1188.

In all cases, it is the necessity and not the desirability of medical treatment sought which is important to the determination of whether medical officials have exhibited deliberate indifference. *Woodall v. Foti,* 648 F.2d 268 (5th Cir. 1981).

Even if a plaintiff establishes that he has a serious medical need, he must also produce evidence of deliberate indifference. *See Mandel*, 888 F.2d. at 788.  That is, it is not enough that the prisoner shows inadequate treatment of a serious medical need; in order to maintain an action grounded in the Eighth Amendment, the prisoner must demonstrate that the defendant or defendants possessed the requisite culpable state of mind.  *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  The requisite state of mind, deliberate indifference, has been compared to the mental state of criminal recklessness.  *See Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994).  In ruling that the test for deliberate indifference is subjective, based on the individual's state of mind, rather than objective, based on a reasonable outside observer, the United States Supreme Court has stated that "it is enough that the official act[] or fail [] to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.  But the Court also noted that "a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*.

"Ultimately," the Eleventh Circuit has stated that "there are thus four requirements: an objectively serious need, an objectively insufficient response to that need, a subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). With these principles in mind, the court will address Plaintiff's claims against the various Defendants in this case.

Plaintiff asserts his requests for treatment of his Hepatitis C have been routinely denied since he was first diagnosed in 2003. He contends his eyesight has diminished, he has digestive problems and constipation, and has suffered pain in his back, left side, and left foot, which he believes is attributable to the disease. It is undisputed Hepatitis C constitutes a serious medical need. It is also undisputed Plaintiff has not been accepted into the Alabama Department of Corrections' Hepatitis C Treatment Program, and thus, has not received treatment for his disease through that program. Nevertheless, the court finds there is no genuine issue of fact with respect to Plaintiff's claim that the defendants were deliberately indifferent to that need.

In *Bender v. Regier*, the Eighth Circuit discussed the intricacies of Hepatitis C treatment and noted the following:

> "Synthetic interferon was released to the market some ten years ago. Until then, no treatment for the Hepatitis C virus existed. By January 2002, a more effective interferon treatment was available, involving a combination of pegylated interferon (interferon with polyethylene glycol) and ribavarin. Interferon treatment has serious potential side-effects, including nausea, anemia, depression, and decomposition of the liver. Its success rate is relatively low-15-30% for regular interferon and 40-50% for pegylated interferon treatment. **The selection of patients for interferon treatment is highly individualized and depends upon many factors.** Treatment is not appropriate for patients with advanced liver problems such as cirrhosis. **Treatment for patients with mild liver problems may be safely deferred. Suitability for treatment is determined by measuring the degree of liver inflammation and fibrosis through a liver biopsy.** However, even if the appropriate threshold levels of inflammation and

15

> fibrosis are present, treatment may be inappropriate if the patient is too young or too old, had a previous organ transplant, or suffers from depression, other mental health problems, heart disease, or untreated chemical dependency."

385 F.3d 1133, 1135 (8th Cir. 2004) (emphases added).

The record reflects Plaintiff has been frequently seen at the Chronic Care Clinic, where his condition has been closely monitored. (Doc. #33-1 at 5). Blood labs have been drawn and read to determine the functioning of Plaintiff's liver, the status of his platelet count, and whether the plaintiff's condition was stable or worsening. *Id.* Dr. Hood's unrebutted testimony, based on his medical training, knowledge of the situation and review of Plaintiff's medical records, is that there is no evidence Plaintiff's ailments are related to his Hepatitis C, Plaintiff would not have qualified for acceptance into the Hepatitis C Treatment Program in 2011, Plaintiff's condition has not worsened because he has not received that treatment, and Plaintiff's present medical condition is not such that he now requires immediate placement into the program. (Doc. #33-1). The record is void of any evidence that Defendants have been deliberately indifferent to Plaintiff's serious medical needs. The record merely shows Plaintiff disagrees with the protocol and method of treating individuals with hepatitis C.

Even under normal circumstances, the mere disagreement between an inmate and medical professionals regarding the suitability or advisability of treatment is not, alone, sufficient to present a constitutional claim. *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991); *Hamm v. Dekalb Co.,* 774 F.2d 1567, 1575 (11th Cir. 1985). This seems especially true in the light of the complicated nature of Hepatitis C therapy and the multitude of factors that go into the determination to provide or withhold treatment. *See, e.g., Young v. Nguyen*, No. 3:07-cv-551-J-32MCR, 2009 WL 2025181 (M.D. Fla.. 2009) (Prison officials were not deliberately indifferent to an inmate's Hepatitis C diagnosis that did not require medical treatment due to its dormant

state); *see also James v. Geerken,* No. 5:10-cv-259-RS-GRJ, 2012 WL 602775 (N.D. Fla. Jan. 20, 2012) (Report and Recommendation of Magistrate Judge); *Baldwin v. Perron*, No. 5:09-cv-372 (CAR), 2011 WL 1059120 (M.D. Ga. Mar.23, 2011); *Baldwin v. Perron*, No. 5:09-cv-372 (CAR), 2011 WL 1103340 (M.D. Ga. Feb.11, 2011) (Report and Recommendation of Magistrate Judge); *Loeber v. Department of Corrections*, No. 5:09-cv-402/RS-MD, 2010 WL 3272611, *2–3 (N.D. Fla. Aug.19, 2010); *Hollis v. Director of Corrections*, 560 F. Supp. 2d 920, 927 (C.D. Cal. 2008).

Plaintiff has no right to insist on a particular court of treatment, and there is no competent evidence the treatment Plaintiff sought for his hepatitis C was appropriate for someone with normal liver enzymes or that treating his constipation with laxatives instead of enrolling him in the Hepatitis C Treatment Program violated the appropriate standard of care given Plaintiff's condition. While it is troubling the appropriate parties with the Alabama Department of Corrections never received or evaluated the Hepatitis C Treatment Referral Form completed and submitted by Defendant Means in December of 201, and this breakdown in communication in the medical process was not discovered until only recently, it is undisputed Plaintiff would not have been a candidate for the program at that time, and there is no evidence to suggest Plaintiff's condition has worsened due to any lack of treatment.

Plaintiff's disagreement with the medical treatment he has received does not present an Eighth Amendment claim. As such, Defendants' motion for summary judgment is due to be granted and Plaintiff's Eighth Amendment medical care claim is due to be dismissed. To the extent Plaintiff is attempting to raise state law claims of medical malpractice or negligence, the court declines to exercise supplemental jurisdiction, and those claims are due to be dismissed, without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

It is squarely and emphatically within the "medical judgment" of the prison physician to decide what treatment to order and when to change treatment protocols. The treatment provided Plaintiff was based on the medical staffs' knowledge and understanding of his disease and the treatments available for it. "[W]hether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995).

Ultimately, Plaintiff's complaint is that the physicians treating him have mistakenly concluded that he is not at this point due to be placed in the Hepatitis C Treatment Program. The medical record is clear, and Plaintiff does not dispute, that the medical staff at LCF has monitored his condition, provided treatment for the consequences of his disease, and have periodically assessed him for treatment alternatives. Essentially, his argument is that they should do more. But this assertion attacks the staff's medical judgment, and this court is ill-equipped to second-guess that medical judgment, especially in light of Plaintiff's inability to present expert medical evidence that there are, in fact, available and effective treatment options. Plaintiff has not made a showing that those treating him have been deliberately indifferent to his medical needs.

### B.    Plaintiff is Not Entitled to Injunctive Relief

It is abundantly clear from the court's discussion that Plaintiff is not entitled to any monetary relief against these Defendants for denial of necessary medical care to this point in time. Further, it is equally clear that Plaintiff is not entitled to any injunctive relief to compel any of the Defendants to provide a certain type of medical treatment. In addition to the reasons explained below (that show Plaintiff is not entitled to any recovery on the merits), the Rule 56

record shows that those Defendants Plaintiff has sued do not have any present authority to place him into the Treatment Program. As noted above, the court is not equipped to second-guess the medical judgments of the physicians who have not admitted Plaintiff into the Treatment Program, or to require them to provide a medical treatment the court has no way of knowing is useful, efficacious, and not harmful to Plaintiff.  Thus, at this point in time, and based on the Rule 56 facts as they now exist, Plaintiff cannot show any entitlement to declaratory or injunctive relief.

      **C.**    **Supplemental State Law Claims**

Title 28, U.S.C. § 1367(c)(3) provides in pertinent part that, "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction, . . .." The court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  Accordingly, those claims should be dismissed, without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

**V.**    **Conclusion**

By separate Order, the court will grant the motion for summary judgment by Defendants and dismiss this action.

**DONE** and **ORDERED** on the 25th of September 2013.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE